Opinion issued February 10, 2011



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-00312-CR

———————————

Tyrone Colbert, Appellant

V.

The State of
Texas, Appellee



 



 

On Appeal from the 180th Judicial District Court 

Harris County, Texas



Trial Court Case No. 1209535

 



 

MEMORANDUM OPINION

          A
jury found appellant, Tyrone Colbert, guilty of the offense of capital murder,[1] and the trial court
assessed his punishment at confinement for life.  In two points of error, appellant contends
that the evidence is legally and factually insufficient to support his
conviction.

          We
affirm.

Background

          Harris
County Sheriff’s Office (“HCSO”) Deputy T. Crosby testified that on January 14,
2009, shortly before midnight, he was dispatched to an apartment complex to
respond to a “weapons disturbance, shots fired” call.  Upon his arrival, he saw a man performing
C.P.R. on a man on the ground while several people watched.  Crosby ordered everyone other than the man
performing C.P.R. to “move back and put their hands on top of their heads,” and
he attempted to secure the scene.  Crosby
then called for emergency medical assistance, and, upon its arrival, he ordered
the man performing C.P.R. to stop.  Crosby escorted the man, who he identified as
Joshua Winchester, to his patrol car, placed paper bags over his hands, and
detained him for further investigation.  Crosby
noted that Winchester was “hysterical and freaking out” and kept repeating “my
buddy got shot.”

Joshua Winchester testified that on
the night of the shooting, he was staying at the apartment of the complainant,
who sold marijuana “on the side.”  That
night, shortly before midnight, Winchester and the complainant were upstairs
getting “a marijuana cigarette ready to smoke” when someone knocked on the
door.  Winchester explained that it was
not common for someone to come by at that late hour, and they believed there
might be a “situation.”  After the
complainant took his shotgun and proceeded downstairs to answer the door,
Winchester “peeked over the balcony to look downstairs to see what was going
on.”  The complainant had the door
“slightly cracked enough to where he could see who [was] outside the
door.”  He then shut the door, locked it,
returned upstairs, and prepared a bag of marijuana.  When Winchester asked who was at the door,
the complainant responded, “Oh, it is nobody. 
Just some people from my neighborhood.” 
The complainant then returned downstairs and gave the marijuana to the
three people outside.  Winchester
explained that he could hear the people downstairs “chitchatting” and “trying
to catch up,” but there did not appear to be any trouble at this point.  However, the tone of the conversation changed
when “one of the guys” said something about how the bag of marijuana did not
“look right.”  Winchester then heard the
door slam and then open, at which point he ran downstairs to “see what was
going on.”  He grabbed the shotgun from
the “crevice where the door and the wall meet up” and “carefully eas[ed] out”
the door.  A person to Winchester’s left started
to run, and Winchester aimed the shotgun at the person, but the shotgun did not
fire.  To Winchester’s right, in his
“peripheral” vision, he saw a “flash of white” and the complainant “tussling
with somebody.”  A man pulled the
complainant’s shirt over his head, and two other men began to run away.  Winchester thought the men “were trying to
rob” them.  A man wearing a gray jacket then
turned around and pulled something out of his waistband that looked like a
firearm.  Winchester then turned around
and tried to take cover in the apartment. 
He then heard gunshots, saw a flash of light, fell into the apartment,
and kicked the door shut.  After a few
seconds, Winchester opened the door, where he saw the complainant on the ground
without his shirt and a “hole in his chest” that “was still smoking.”  After Winchester began performing C.P.R. on
the complainant, a few neighbors came outside and began helping.  Winchester then went back inside the apartment
to hide the marijuana and the shotgun. 
He explained that he was “paranoid” about the marijuana because he was
the only person in the apartment, and he hid the shotgun because someone had
been shot outside and it was the only weapon. 
Winchester noted that he was worried about “getting into trouble” and concerned
that he might be accused of shooting the complainant.  Once police officers and emergency medical assistance
arrived, an officer escorted Winchester to the back of a police car for
questioning.  Winchester explained that
when he initially spoke with the officer we was not completely truthful because
he “was nervous and felt like [] they were trying to pin everything on”
him.  Winchester did not initially tell
the police officers or investigators about the marijuana or the shotgun.  

Charlie Fenceroy, a neighbor of the
complainant, testified that on January 14, 2009, while lying in bed, he “heard
two guys arguing outside” of his apartment, and he recognized his neighbor’s
voice.  He explained that he heard
someone knocking at his neighbor’s door, someone run up and back down the
stairs, and men “arguing about something wasn’t right.”  Soon after, Fenceroy heard six gunshots.  He then opened his door to determine if he
could see anything, when he saw his “neighbor laying on the concrete” wearing
jeans and no shirt.  Fenceroy noted that
his neighbor’s “pants pockets were turned inside out” and he had “wounds to his
chest and head area.”  

HCSO Deputy A. J. Kelly testified
that he was the lead detective assigned to investigate the death of the
complainant.  After Kelly obtained a
warrant to arrest appellant for the offense of murder, appellant was arrested
and brought to the sheriff’s office where Kelly informed him of his legal
rights.  Appellant agreed to give a
statement, which Kelly video-recorded.  During
trial, the State played the video-recorded interview of appellant for the
jury.  In his statement, appellant
provided varying explanations of the nights’ events.  Appellant first explained that he went with “Willie
J.,” “J. Bang,” “Mike,” “Mike’s girlfriend,” and “Alexis,” the appellant’s
girlfriend, to purchase some marijuana from the complainant.  Appellant identified “Willie J.” as Willie
Bryant, “J. Bang” as Joshua Holmes, and “Mike” as Michael Holmes.  The group took two cars to the complainant’s apartment
complex, and appellant remained in a car with his girlfriend while the others
went to purchase the marijuana.  Appellant
believed that the group was taking too long, so he exited the car to see what
was happening.  Appellant initially
stated that he did not have a gun that night. 
When he walked up to the apartment, appellant saw “Willie J.” “arguing”
and “fighting” with the complainant, and appellant joined the fight.  A person then exited the apartment, pointed
what appeared to be a “rifle” at the group, and then fired the weapon in their
direction.  Appellant then “took off
running,” and he thought he fell while running away.  However, appellant claimed that he “did not
discharge [his] weapon.”  Appellant
admitted that during the fight with the complainant, the complainant’s shirt “came
off,” and appellant took the shirt with him because he thought it had his
“D.N.A. on it.”  He noted that he later “poured
some bleach” on the shirt and threw it away. 

Appellant then stated that although
“J. Bang and his brother had been talking about robbing the [complainant],”
appellant did not go there “with the intention to rob” anyone.  Appellant explained that although “J. Bang”
keeps a handgun at his house, appellant was not sure if he had it with him on
the night of the shooting.  Appellant
remembered hearing seven to nine shots as he was “running off,” but he did not
know who fired the shots.  Appellant
again stated that he was not “carrying a gun that night.”  

After a break, appellant then
changed his statement, emphasizing that the group did go to the complainant’s
apartment to rob him of narcotics and money. 
He then stated that “Willie J.” shot the complainant with “J. Bang’s
revolver.”  Appellant claimed that he
“did not shoot that man.”  After further
questioning, appellant changed his statement again, asserting that the marijuana
deal “went sour,” but he did not “go [to the complainant’s apartment] to hurt
anyone.”  He explained that although he
and others in his group “went with the intention of robbing [the complainant]
of drugs and money,” after the person in the house “pulled out” a firearm, appellant
“flipped” approximately four shots.  He
stated that he “just started shooting,” he was “not looking, just trying to get
out of the way.”  And he was not aware of
whether he had hit anyone with any of the shots.  Appellant admitted that the firearm that he
used belonged to “J. Bang,” but he did not know the location of the firearm
after the shooting.  Appellant then again
stated that it was “everyone’s plan to rob” the complainant.  

Harris County Assistant Medical
Examiner D. Phatak testified that he performed an autopsy on the complainant’s
body.  He explained that the complainant
had “lacerations of his nose and his [left] eyebrow” and a gunshot wound on the
left side of his chest.  Phatak also
observed “stippling” around the gunshot wound and the complainant’s left arm,
which he explained as “small punctuate burdens [] caused by burning powder
fragments that also exit the end of the gun as it is fired.”  Phatak explained that stippling does not
occur with every gunshot, rather it “only happens when the end of the gun is
from six inches to one foot away from the skin.”  Phatak concluded that the complainant’s
“cause of death was a gunshot wound to the chest” that “perforated [] the
heart, the right lung, diaphragm, and the liver,” all of which are “vital
organs to human survival.”  

Standard of Review 

We review the legal sufficiency of the evidence by
considering all of “the evidence in the light most favorable to the prosecution”
to determine whether “any rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt.”  Jackson v. Virginia, 443 U.S. 307, 318–19, 99 S. Ct.
2781, 2788–89 (1979).  Evidence is legally
insufficient when the “only proper verdict” is acquittal.  Tibbs
v. Florida, 457 U.S. 31, 41–42, 102 S. Ct. 2211, 2218 (1982).  Our role is that of a due process safeguard,
ensuring only the rationality of the trier of fact’s finding of the essential
elements of the offense beyond a reasonable doubt.  See Moreno v. State, 755 S.W.2d 866, 867 (Tex.
Crim. App. 1988).  We give deference to
the responsibility of the fact finder to fairly resolve conflicts in testimony,
to weigh evidence, and to draw reasonable inferences from the facts.  Williams v. State, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).  However, our duty requires us to “ensure that
the evidence presented actually supports a conclusion that the defendant
committed” the criminal offense of which he is accused.  Id. 

We now review the factual sufficiency of the evidence under the same
appellate standard of review as that for legal sufficiency.  Ervin v. State,
No. 01-10-00054-CR, 2010 WL 4619329, at *2–4 (Tex. App.—Houston [1st Dist.]
Nov. 10, 2010, no pet. h.) (citing Brooks
v. State, 323 S.W.3d 893 912, 926 (Tex. Crim. App. 2010)).  

Sufficiency of the Evidence

In his first point of error, appellant argues that the evidence is
legally insufficient to support his conviction because “the State failed to
sufficiently prove that the complainant was killed during the course of a
robbery” and he had “the requisite intent to kill the complainant when he
pulled the trigger.”  In his second point
of error, appellant argues that the evidence is factually insufficient to
support his conviction because the evidence that “the complainant was shot in
the course of a robbery” and “appellant actually intended to kill the
complainant” is so weak that the verdict is clearly wrong and manifestly
unjust.  

A person commits the
offense of capital murder if he
intentionally or knowingly causes the death of an individual and does so in the
course of committing or attempting to commit robbery.  Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(2)
(Vernon 2003 & Supp. 2010); Sholars v. State, 312 S.W.3d 694, 703 (Tex. App.—Houston [1st Dist.] 2009,
pet. ref’d).  A person commits a
robbery if, in the course of committing theft and with intent to obtain or
maintain control of property, he intentionally or knowingly threatens or places
another in fear of imminent bodily injury or death.  Tex. Penal Code Ann. § 29.02(a)(2)
(Vernon 2003).  Aggravated robbery is robbery with the use or
exhibition of a firearm.  Id. §§ 29.02, 29.03 (Vernon 2003). 

Murder Committed in the Course of
Robbery

          Appellant
first argues that no rational juror could have found beyond a reasonable doubt
that he shot the complainant during the course of a robbery or attempted
robbery because it is “not enough that at some point earlier in the evening the
suspects intended to rob the complainant,” but that “they must have been
actually robbing him or attempting to rob him at the time of the shooting.”  

Appellant asserts that
there is “no evidence that the robbery ever actually materialized,” “the only
evidence presented at trial was [] appellant’s statement that the suspects
planned to rob the complainant earlier in the evening,” and “plans change.”  Appellant notes that Winchester only heard the
parties arguing about the weight of the marijuana and “he never saw any weapons
until after he charged out of the apartment with the shotgun drawn.”  

However, in order to prove capital murder it was not necessary for
the State to prove that appellant completed the theft in order to establish the
underlying offense of robbery or attempted robbery; rather, the jury may have
inferred the intent to rob from the circumstantial evidence, particularly appellant’s
assaultive conduct.  See Young v. State, 283 S.W.3d 854, 862 (Tex. Crim. App. 2009); see also Bustamante v. State, 106 S.W.3d
738, 740 (Tex. Crim. App. 2003).  For
capital murder, the State must only show that an intent to commit robbery was
formed prior to the murder.  Robertson v. State, 871 S.W.2d 701, 705
(Tex. Crim. App. 1994); Moody v. State,
827 S.W.2d 875, 892 (Tex. Crim. App. 1992) (noting that to prove murder
committed in course of robbery State must prove nexus between murder and theft
such that “murder occurred in order to facilitate the taking of the property”).  To constitute
capital murder committed in the course of a robbery, an intent to rob must be
formulated before or at the time of the murder. 
Herrin v. State, 125 S.W.3d
436, 441 (Tex. Crim. App. 2002).  

Here, the
State presented appellant’s video-recorded statement, in which appellant
admitted that the men intended to rob the complainant of narcotics and
money.  Appellant also admitted to taking
the complainant’s shirt.  Although
appellant stated that the complainant had a bag of marijuana when he left the
apartment, no marijuana was recovered from his possession.  Also, appellant acknowledged that the marijuana
was taken by one of the men who was with appellant at the time of the shooting.  Appellant’s statement shows that he and those
with him had formed an intent to commit robbery prior to the time of the
murder.  Additionally, Fenceroy testified
that he saw the complainant with his pockets inside out, and Winchester
saw the complainant “tussling” with one of the men as they pulled his shirt
off.  Viewing the evidence in the light
most favorable to the prosecution, we conclude that a rational trier of fact
could find beyond a reasonable doubt that appellant formed the intent to commit
a robbery before or at the time of the murder. 
Accordingly, we hold that the evidence is sufficient to support the
jury’s implied finding that appellant shot the complainant in the course of a
robbery.  

Intent to Kill

          Appellant
next argues that the evidence is insufficient to prove that he had a specific
intent to kill the complainant because the evidence shows his shot was “a
reflexive move with no conscious intent to do anything other than simply get
away.”  

In order to prove
capital murder, the evidence must show that the defendant had the specific
intent to kill.  See Rousseau v. State,
855 S.W.2d 666, 673 (Tex. Crim. App. 1992).  “[I]ntent to kill may be inferred from
the use of a deadly weapon, unless it would not be reasonable to infer that
death or serious bodily injury could result from the use of the weapon.”  Sholars, 312 S.W.3d at 703; Dominguez v. State, 125 S.W.3d 755, 761 (Tex. App.—Houston
[1st Dist.] 2003, pet. ref’d) (holding evidence permitted inference of intent
to kill when defendant and other members of his gang planned to rob person
walking alone at night, and, in course of theft or attempted theft of complainant,
defendant retrieved loaded shotgun from car trunk and shot complainant in abdomen,
resulting in complainant’s death); see Staley v. State,
887 S.W.2d 885, 889 (Tex. Crim. App. 1994).  A
firearm is a deadly weapon per se.  Tex. Penal Code Ann. § 1.07(a)(17)(A)
(Vernon Supp. 2010).  Moreover, intent may also be inferred
from the means used and the wounds inflicted, and as a factual matter, intent
is to be determined by a jury from all the facts and circumstances in evidence.
 See Hemphill v. State, 505 S.W.2d 560, 562 (Tex. Crim. App.
1974).  “When a deadly weapon is fired at
close range, and death results, the law presumes an intent to kill.”  Sholars, 312 S.W.3d at 703; Ervin v. State, No. 01-08-00121-CR,
2010 WL 3212095, *7 (Tex. App.—Houston [1st Dist.] Aug. 11, 2010, pet. ref’d).

Appellant asserts that
“the State was required to prove that he actually wanted the complainant to
die” and the evidence shows, “at most, appellant shot in the complainant’s
direction[] in a panic while trying to escape [Winchester,] who was bearing
down on the suspects with a shotgun,” and appellant’s reaction was “defensive”
and “performed in the panic of the moment.” 
Appellant also asserts that the testimony of Winchester, “the only
witness that was actually present when this incident occurred,” shows appellant
did not have the specific intent to kill. 
In particular, he points to Winchester’s testimony that none of the men
present had a firearm out when Winchester exited the apartment and pointed the
shotgun in appellant’s direction and, once Winchester pulled out the firearm,
the men “scattered and the person who shot the complainant, fired behind him as
he was running away.” 

Viewing
all of the evidence in the light most favorable to the prosecution, the
evidence shows that appellant admitted to bringing a firearm to the
complainant’s apartment and firing it in the direction of the complainant.  The complainant was found shot in the chest,
and, as testified to by Phatak, the complainant’s wound was consistent with a
gunshot fired at close range.  The jury could
have reasonably inferred that appellant intended to kill the complainant when
he pointed the firearm in the complainant’s direction and fired the shots.  See Sholars,
312 S.W.3d at 704.  Winchester did
testify that the shots were fired as the shooter was running away.  However, Phatak testified that the “stippling”
on the complainant’s body was consistent with shots being fired from six inches
to one foot away from his chest.  As
the exclusive judges of the facts, the credibility of the witnesses, and the
weight to be given their testimony, the jurors were free to believe or
disbelieve all or any part of the testimony. 
McKinny v. State,
76 S.W.3d 463, 468–69 (Tex. App.—Houston [1st Dist.] 2002, no pet.). 


We conclude that a
rational trier of fact could have found beyond a reasonable doubt that
appellant had the specific intent to kill the complainant when he fired a
deadly weapon in the complainant’s direction at close range.  See
Sholars, 312 S.W.3d at 703.  Accordingly, we hold
that the evidence is sufficient to support the jury’s implied finding that
appellant shot the complainant with the intent to kill him.  

We overrule
appellant’s first and second points of error.

Conclusion

          We
affirm the judgment of the trial court.  

 

 

                                                                   Terry
Jennings

                                                                   Justice


 

Panel
consists of Justices Jennings, Higley, and Brown.

Do
not publish.  Tex. R. App. P. 47.2(b).











[1]           See
Tex. Penal Code Ann. § 19.03
(Vernon Supp. 2010).